**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| | **CRIMINAL FILE NO.** |
| **v.** | **1:13-CR-276-ODE-GGB** |
| **DEREK C. TURNER, LADARIOUS GIBBS, LARRY STINSON, JR., ANDRE CLARK,  RONALD WASHINGTON, BRANDON WASHINGTON, and RAPHEAL BANKS,** | **Magistrate Judge Gerrilyn G. Brill** |
| **Defendants.** | |

**REPORT AND RECOMMENDATION**

Defendants are charged in a second superseding indictment [Doc. 106] as follows:

Count One:      Carjacking on December 29, 2012 by Defendants Gibbs and Clark;

Count Two:      Using and carrying a firearm during December 29, 2012 carjacking by Defendant Clark;

Count Three:      Using and carrying a firearm during December 29, 2012 carjacking by Defendant Gibbs;

Count Four:      Carjacking from "T.T." on January 2, 2013 by Defendants Gibbs, Ronald Washington, Brandon Washington, and Clark;

Count Five:            Using and carrying a firearm during January 2, 2013 "T.T." carjacking by Defendant Brandon Washington;

Count Six:             Carjacking from "A.H." on January 2, 2013 by Defendants Gibbs, Ronald Washington, Brandon Washington, and Clark;

Count Seven:           Using and carrying a firearm during January 2, 2013 "A.H." carjacking by Defendant Gibbs;

Count Eight:           Carjacking from "T.W." on January 11, 2013 by Defendant Turner;

Count Nine:            Carjacking from "C.G. and T.S." on January 11, 2013 by Defendant Turner;

Count Ten:             Using and carrying a firearm during January 11, 2013 carjacking from "C.G. and T.S." by Defendant Turner;

Count Eleven:          Carjacking from "T.D." on January 18, 2013 by Defendants Gibbs, Turner, and Stinson;

Count Twelve:          Using and carrying a firearm during January 18, 2013 carjacking  from "T.D." by Defendants Turner and Gibbs;

Count Thirteen:        Carjacking from "R.W." on January 18, 2013 by Defendants Gibbs, Turner, Stinson, and Banks;

Count Fourteen:        Using and carrying a firearm during January 18, 2013 carjacking from "T.D." by Defendant Turner; and

Count Fifteen:         Using and carrying a firearm during January 18, 2013 carjacking from "T.D." by Defendant Gibbs.

[Doc. 106].

2

The following Motions are pending before the Court:

**Defendant Turner**

• Preliminary <u>Bruton</u> Motion to Suppress Statements of Non-Testifying Co-Defendants [Doc. 57];

• Preliminary Motion to Suppress Statements Obtained in Violation of Defendant's Sixth Amendment Right to Counsel [Doc. 58; Amended Motion to Suppress, Doc. 69];

• Motion to Dismiss for Violation of Speedy Trial Act [Doc. 59; Amended Motion for Speedy Trial Dismissal, Doc. 70];

• Motion to Suppress Warrantless Seizure of Historical Cell Site Location Information [Doc. 230].

**Defendant Gibbs**

• Motion to Suppress Evidence  [Doc. 55; Amended Motion to Suppress Evidence, Doc. 68; Second Supplemented Motion, Doc. 83];

• Motion to Suppress Statements [Doc. 78].

**Defendant Clark**

• Preliminary Motion to Suppress Statements [Doc. 228];

• Preliminary Motion to Suppress Identification [Doc. 229].

3

**Defendant Ronald Washington**

• Motion to Suppress Statements on Feb 8, 2013 [Doc. 197];

• Motion to Suppress Search and Seizure of Cell Phones [Doc. 200; Amended Motion to Suppress, Doc. 225].

**Defendant Brandon Washington**

• Motion to Suppress Statements [Doc. 205; Supplemented, Doc. 264].

**Defendant Banks**

• Motion to Suppress [Doc. 191; Amended Motion, Doc. 262];

• Motion to Sever Defendant [Doc. 194];

• Handwritten *pro se* Motion [Doc. 284].

Evidentiary hearings were held on January 12, 2015 [Doc. 256 (Evidentiary Hearing Transcript, Vol. I)] and January 13, 2015 [Doc. 257 (Evidentiary Hearing Transcript, Vol. II)].  All pending motions are discussed below.

## I.   <u>BRUTON</u> ISSUES THAT PREVENT JOINT TRIALS

In <u>Bruton v. United States</u>, 391 U.S. 123, 88 S. Ct. 1620 (1968), the Supreme Court held that the admission of a co-defendant's confession at a joint trial violates the defendant's right to confrontation if the confession also incriminates the defendant. In this case, several of the defendants have made statements that incriminate other defendants, and the government intends to use those statements in separate trials.

4

According to the government, the only trial pairings that would **not** present <u>Bruton</u> problems in this case are:  Brandon Washington and Larry Stinson,[1] Andre Clark and Rapheal Banks, Derek Turner and Ronald Washington,[2] and Derek Turner and Andre Clark.  Ladarious Gibbs must be tried separately.  [Doc. 257 at 6-7, 131-33].[3]

Therefore, I **RECOMMEND** that Defendant Derek Turner's <u>Bruton</u> motion [Doc. 57] be **GRANTED** to the extent that he seeks suppression of statements of non-testifying co-defendants that implicate him.

## II.    TURNER'S CUSTODIAL STATEMENTS

### A.    Facts Relating to Turner's Custodial Statements

On January 31, 2015, Defendant Derek Turner ("Turner") was arrested by the United States Marshals Service's Fugitive Squad on a Cobb County, Georgia arrest warrant in connection with a carjacking that had taken place in Cobb County on January 18, 2013.  [Doc. 256 at 9, 27-28, 30].  After Turner's arrest, he was transported to the Cobb County Police Department ("CCPD") where he was interviewed by CCPD's

---

[1]  The government believed that Stinson was going to enter a guilty plea. [Doc. 257 at 132].

[2]  Ronald Washington entered a guilty plea. [Doc. 232].

[3]  The Court notes that unless otherwise indicated, citations to the evidentiary hearing transcripts [Docs. 256, 257] are to the docket number and page number shown in the CM/ECF headings in the electronic versions filed with the Court rather than to the page numbers reflected in the hardcopy transcripts.

Sergeant Noles. Id. Sgt. Noles advised Turner of his Miranda rights. [Doc. 256 at 9, 11-15; Gov't Ex. 1]. After Turner was advised of his rights, Turner signed under the pre-printed portion of the form entitled "Waiver of Rights." [Gov't Ex. 1]. Turner then made a statement. [Gov't Ex. 2].

At the conclusion of Sgt. Noles's interview, Turner was introduced to Detective Zimbrick with the Atlanta Police Department ("APD"). Det. Zimbrick told Turner that the APD was investigating numerous carjackings and armed robberies in the city, and that he wished to speak to Turner about these crimes. At the beginning of the interview, Det. Zimbrick advised Turner of his Miranda rights by reading those rights off of a card. [Doc. 256 at 36-37; Gov't Ex. 3]. After being advised of his rights, Turner responded that he understood his rights and that he was interested in talking to Det. Zimbrick. [Doc. 256 at 38]. Turner never asked for an attorney or for the interview to stop. Det. Zimbrick did not threaten Turner or make any promises to him. [Id. at 39].

On February 1, 2013, Turner had his first appearance before a Cobb County Superior Court judge while Turner was in the Cobb County jail. [Doc. 257 at 114, 116; Gov't Ex. 21]. Sometime later that month, Turner's mother called Det. Zimbrick to tell the detective that Turner wanted to speak with him to give him additional information. [Doc. 256 at 43-44]. Det. Zimbrick contacted Cobb County officers to arrange an

interview with Turner.  [Id. at 44].  The interview took place on February 15, 2013. [Gov't Ex. 4].

At the February 15, 2013 interview, Det. Zimbrick introduced himself to Turner and told him that Turner's mother had called him and said that Turner wanted to speak with the detectives.  [Doc. 256 at 45].  Turner acknowledged in the tape-recorded interview that he had called the agents (through his mother) in order to talk to them, and that is why the agents were there**.**  [Gov't Ex. 4 at 00:06-00:57].  Det. Zimbrick read Turner his Miranda warnings from his APD card.  Turner stated that he understood his rights and agreed to talk with the officers.  Turner made a statement and did not ask for an attorney at any time.  [Gov't Ex. 4].

In March of 2013, Turner's mother again called Det. Zimbrick and asked that he return to the jail to speak with Turner at Turner's request.  [Doc. 256 at 51].  Det. Zimbrick contacted Det. Thorp with Cobb County, who made arrangements to interview Turner at the Cobb County jail.  [Id.].  On March 5, 2013, detectives Zimbrick and Thorp met with Turner.  [Id. at 52].  Turner acknowledged in a recorded interview that he had again asked his mother to get in contact with the detectives and that Turner wanted to speak with them.  [Gov't Ex. 5 at 00:00-00:40].  Det. Zimbrick again read Turner his Miranda rights.  Turner stated that he understood his rights and agreed to talk

7

to the detectives.  [Id.; Doc. 256 at 52-53; Gov't Ex. 3].  Turner did not ask for an attorney.  [Doc. 256 at 55; Doc. 257 at 121; Gov't Ex. 5].

Sometime between mid March and April 2013, Federal Bureau of Investigation Special Agent ("S/A") Larry Guerra and Cobb County Det. Thorp met and discussed the possibility of Turner's case being prosecuted in federal court.  Shortly thereafter, S/A Guerra began a federal investigation.  [Doc. 257 at 122-24].

On April 18, 2013, Turner was indicted in Cobb County for armed robbery, aggravated assault, hijacking a motor vehicle, and possession of a firearm during the commission of a felony.  [Doc. 257 at 92; Doc 69-1 at 8 (Attachment H, Gen. Bill of Indictment)].  Turner was formally arraigned on those charges in Cobb County Superior Court on June 24, 2013.  [Doc. 257 at 94, 96, 98; Gov't Ex. 19].  During his arraignment, Turner asked for an attorney.  [Doc. 257 at 99; Gov't Ex. 19 at 8].  Turner stated that he had already applied for a court-appointed attorney by filling out five forms.  [Gov't Ex. 19 at 2].  During the proceedings, the Assistant District Attorney informed the court that the case was going to be indicted federally.  [Id.; Doc. 257 at 97].

On July 10, 2013, Turner was indicted in this case.  [Doc. 1].  He was arraigned in this court on August 28, 2013 and an attorney was appointed to represent him in this case on that date.  [Doc. 26].

8

### B.   Discussion of Turner's Motions to Suppress Statements

Turner argues that his statements should be suppressed because at the time he made his statements, he had not been appointed counsel. [Docs. 58, 69]. He argues that his statements were obtained in violation of his Sixth Amendment right to counsel.

The Sixth Amendment prohibits the admission of statements deliberately elicited by the government from a defendant after adversary criminal proceedings have begun, unless the defendant's counsel is present or the defendant waives his right to counsel. Massiah v. United States, 377 U.S. 201, 205-06, 84 S. Ct. 1199, 1202-03 (1964); United States v. Gunn, 369 F.3d 1229, 1237 (11th Cir. 2004). The Sixth Amendment right to counsel attaches at a "criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction." Rothgery v. Gillespie County, 554 U.S. 191, 213, 128 S. Ct. 2578, 2592 (2008).

Because Turner's initial interview took place on January 31, 2013, the day before his initial appearance before a judge on February 1, 2013, his Sixth Amendment right to counsel had not yet attached. Therefore, law enforcement officers did not obtain Turner's statements on January 31, 2013 in violation of Turner's Sixth Amendment right to counsel.

At the time of his later interviews, Turner's Sixth Amendment right to counsel had attached because those interviews took place after Turner's first appearance before

9

a judge.[4]   However, as documented in recordings entered into evidence, Turner acknowledged that he had initiated the interviews with the officers by having his mother call the officers and ask them to return to the jail to talk to Turner.  [Gov't Exs. 4 and 5].

A defendant may waive his Sixth Amendment right to counsel "so long as relinquishment of the right is voluntary, knowing, and intelligent."  Montejo v. Louisiana, 556 U.S. 778, 786, 129 S. Ct. 2079, 2085 (2009).  A defendant waives his Sixth Amendment right to counsel by initiating contact with law enforcement in order to speak with them. United States v. Gonzalez, 183 F.3d 1315, 1323-24 (11th Cir. 1999) (finding that defendant had waived his Sixth Amendment rights by initiating contact with police through his wife), *superseded by regulation on other grounds as stated in* United States v. Diaz, 248 F.3d 1065, 1107 & n.59 (11th Cir. 2001).

Here, having reviewed the record and exhibits, I find that Turner was given and waived his Miranda rights prior to all interviews by law enforcement.  Also, by initiating the contacts with law enforcement, Turner waived his Sixth Amendment rights after they had attached at his initial appearance.  Considering the totality of circumstances, I find that Turner's relinquishment of his rights was voluntary, knowing, and intelligent.

---

[4]  Turner does not state when he believes his Sixth Amendment right to counsel attached.  However, the government concedes that Turner's right to counsel attached at his first appearance on February 1, 2013.  [Doc. 285 at 6 n.3].

Therefore, I **RECOMMEND** that Defendant Turner's Motions to Suppress Statements [Docs. 58 and 69] be **DENIED**.

## III.   TURNER'S SPEEDY TRIAL MOTIONS

Turner argues that the Speedy Trial Act, 18 U.S.C. § 3161(b), was violated when he was not indicted within thirty days of his arrest. [Docs. 59, 70]. The Speedy Trial Act provides that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). Failure to comply with this schedule results in dismissal of charges, and the court has discretion to dismiss with or without prejudice based on the seriousness of the offense; the facts and circumstances of the delay that led to the dismissal; and the impact of another prosecution on the administration of justice. 18 U.S.C. § 3162(a)(1).

However, Turner's argument rests on the incorrect premise that the thirty days should be counted from the time that he was arrested on state court charges. It is well settled that the thirty-day Speedy Trial Act clock does not start to run until the defendant is arrested on federal charges. See United States v. Skanes, 17 F.3d 1352, 1353 n.1 (11th Cir. 1994) ("It was not until [defendant] was taken into federal custody . . . that the time constraints of the Speedy Trial Act were triggered," despite earlier arrest on

11

charges by state authorities); <u>United States v. Bell</u>, 833 F.2d 272, 277 (11th Cir. 1987) ("It was only after the federal indictment was returned . . . that the clock under the Speedy Trial Act began running" following arrest on state charges); <u>United States v. Russo</u>, 796 F.2d 1443, 1451 (11th Cir. 1986) (same).

Defendant contends that his initial arrest should be considered a federal arrest because he was arrested by a federal law enforcement task force. [Doc. 70 at 1-2, 8, ¶¶ 6, 36]. However, this argument had been rejected by the Eleventh Circuit. The Eleventh Circuit has held that the Speedy Trial Act clock is not triggered even if there is substantial or exclusive federal involvement in the investigation and initial arrest of the defendant on state charges. <u>See Russo</u>, 796 F.2d at 1451.

Turner also contends that his constitutional right to a speedy trial was violated. Constitutional speedy-trial challenges are subject to a four-factor test established by the Supreme Court in <u>Barker v. Wingo</u>, 407 U.S. 514, 92 S. Ct. 2182 (1972). The factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the speedy trial right; and (4) prejudice to the defendant. <u>Id.</u> at 530, 92 S. Ct. at 2192. Turner has not addressed these factors in his motions or made any argument explaining how his constitutional right to a speedy trial has been violated. While there has been a lengthy delay in this case, the delay has mainly been due to the consideration of pending motions. Indeed, Turner's counsel requested and received a continuance of the

evidentiary hearing that was originally scheduled for December 8-9, 2014.  [Docs. 223, 226].

For these reasons, I **RECOMMEND** that Defendant Turner's Speedy Trial Motions [Docs. 59, 70] be **DENIED**.

## IV.   TURNER'S MOTION TO SUPPRESS WARRANTLESS SEIZURE OF HISTORICAL CELL SITE LOCATION INFORMATION

Turner argues that the government violated his Fourth Amendment rights when it obtained his historical cell site location information by court order under 18 U.S.C. § 2703(d) rather than by search warrant.  [Doc. 230].  However, the Eleventh Circuit recently ruled that the government does not need to obtain a search warrant in order to obtain historical cell site information when it proceeds under 18 U.S.C. § 2703(d).  United States v. Davis, No. 12-12928, 2015 WL 2058977, at *18 (11th Cir. 2015) (en banc).  Section 2703(d) requires a government showing and a court order that there are "specific and articulable facts that show that there are reasonable grounds to believe" that the records sought are relevant and material to an ongoing criminal investigation. Id. at *17.  Turner acknowledges that a court order specifically found that "the State has offered specific and articulable facts showing that there are reasonable grounds for disclosure, and that the records sought are material to an ongoing criminal

13

investigation." [Doc. 230 at 2 ¶ 3].  He does not dispute that the showing and order required by Section 2703(d) were made.  Therefore, his motion is foreclosed by Davis.

For these reasons, I **RECOMMEND** that Defendant Turner's Motion to Suppress Warrantless Seizure of Historical Cell Site Location Information [Doc. 230] be **DENIED**.

## V.   GIBBS'S MOTIONS TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT

### A.   Facts Relating to Search Warrant

On January 24, 2013, Detective Geoffrey Edgecomb of the Cobb County Police Department submitted an affidavit and application for a search warrant to a judge of the Magistrate Court of Clayton County, Georgia.  [Doc. 76-3 at 1].  The application sought a warrant to search 1624 Norman Drive, Apartment 1703, in Atlanta, Clayton County, Georgia for evidence of carjacking, armed robbery, and aggravated assault.

The affidavit and application set forth the following facts as probable cause for the search:

> On 1/18/2013 at approximately 1312 hours[,] an aggravated assault and carjacking occurred at 2955 Cobb Parkway, Atlanta, Georgia 30339 in the jurisdictional boundaries of Cobb County.  The female victim was about to enter her vehicle in the parking lot of a retail establishment when she was approached by two black males; both of whom were wearing red hooded sweatshirts.  One of the males pressed a silver handgun against the victim's body and demanded the

14

keys to her 2012 BMW Model X5.   The suspects then grabbed the victim's purse away from her, removed her vehicle keys and entered the vehicle.  The suspects then drove the vehicle away from the scene. The victim was taken to the hospital for medical evaluation due to being pregnant.  The victim stated that her purse contained her identification, checkbook, credit cards, and other personal papers. **The victim's vehicle was later recovered by the Georgia State Patrol and a suspect was taken into custody who occupied said vehicle.  During an interview the suspect provided information identifying one of the carjackers.  The victim was able to identify the suspect, Ladarius Gibbs, during a photographic line-up procedure and a warrant was obtained for his arrest on 1/21/2013.**   The United States Marshal's Service began an investigation to locate and apprehend Ladarius Gibbs.   On 1/24/2012 [sic] he was located at 1646 Norman Drive, Apartment 1703, Atlanta, Clayton County, Georgia 30349.  (Stonebrook Apartments). Information was provided to the affiant that Ladarius Gibbs frequents the location and keeps personal property inside of the apartment. It has become known to the affiant that several other Metro Atlanta jurisdictions are investigating Ladarius Gibbs for armed robberies, car jackings, aggravated assaults, and gang activity at the time of this application.  The U.S. Marshal's Service indicated to our agency that Gibbs has frequented this apartment where he was apprehended.

[Doc. 76-3 at 1-2 (emphasis added)].   Based on this affidavit and application, the

Clayton County magistrate judge issued the requested warrant.  [Id. at 3-5].

    As set forth above, immediately following the statement that the arrested occupant

of the victim's vehicle identified one of the carjackers, the search warrant application

contains the erroneous fact that the *victim* was able to identify Gibbs during

15

a photographic line-up procedure.  [Id. at 2].  The victim did not identify Gibbs, however;  instead, it was co-defendant Rapheal Banks who identified Gibbs from a photographic line-up.  [Doc. 254 at 8, 11; Doc. 256 at 184; Doc. 76-1 at 1]. The information contained in the Clayton County search warrant affidavit had been conveyed from Det. Thorp, who applied for the arrest warrant, to a different officer, Det. Edgecomb, who applied for the Clayton County search warrant.  [Doc. 254 at 11; Docs. 76-1, 76-3].

As correctly set forth in Det. Thorp's Cobb County application for the arrest warrant for Gibbs, the driver of the victim's vehicle (i.e., Banks, who was not identified in the application) was arrested in the vehicle three hours after the carjacking.  Banks provided detailed information about Gibbs and his accomplice, stating that he [Banks] had received the vehicle shortly after the robbery.  Banks provided accurate details about the crime, stated that he was personally acquainted with Gibbs, and positively identified Gibbs in a sequential photographic lineup.  [Doc. 76-1 at 1].

### 2.    Discussion of Search Warrant

As an initial matter, I note that the government does not dispute that Gibbs has standing to challenge the search warrant.  [Doc. 275 at 2 n.1].  Gibbs has provided a sworn statement in which he states that he slept at the residence and kept personal property at the residence during and around the time of the execution of the search and

16

arrest warrants. [Doc. 83]. I find that Gibbs has made a sufficient showing that he has standing to challenge the search warrant.

Gibbs moves to suppress evidence seized pursuant to the search warrant on the ground that there was a material misrepresentation in the application for the search warrant, to wit, that the victim of the alleged carjacking had identified Mr. Gibbs. [Docs. 55, 68, 83; Doc. 266 at 7].

Affidavits supporting arrest warrants are presumptively valid. Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684 (1978). Thus, a defendant is generally not entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a search warrant affidavit. A defendant has the constitutional right to such a hearing – a Franks hearing – only where he "makes a substantial preliminary showing" that (1) the affiant deliberately included a false statement in the affidavit or deliberately omitted material information, or made the false statement or omission with reckless disregard for the truth; and (2) the false statement or omission altered the probable cause showing. Franks, 438 U.S. at 155-56, 98 S. Ct. at 2676; United States v. Kapordelis, 569 F.3d 1291, 1309-10 (11th Cir. 2009).

Here, Gibbs did not make the required preliminary showing to warrant a Franks hearing. First, he did not make a substantial showing that Det. Edgecomb made a false statement, either deliberately or with reckless disregard for the truth. The detective first

17

correctly stated that the victim's vehicle had been recovered and that the occupant of that vehicle was taken into custody and provided information identifying one of the carjackers. It is likely that his next statement regarding the *victim's* identification, as opposed to the identification by the occupant of the victim's vehicle, was an innocent error, and Gibbs has not shown otherwise. If anything, the correct information – *i.e.*, that it was the occupant of the victim's vehicle who made the identification of Gibbs – would have provided stronger probable cause because that accomplice knew Gibbs and the details of the crime, and thus was more likely to make an accurate identification. Accordingly, any misstatement in the affidavit was not "material." See Kapordelis, 569 F.3d at 1309.

For these reasons, Gibbs has not made the required showing under Franks, and his Motions to Suppress Evidence [Docs. 55, 68, 83] seized pursuant to the search warrant should be **DENIED**.

## VI.  GIBBS'S MOTIONS TO SUPPRESS STATEMENTS

### A.  Facts Relating to Gibbs's Custodial Statements

Gibbs was arrested on January 21, 2013 in Clayton County, Georgia pursuant to an arrest warrant issued in Cobb County for armed robbery and hijacking of a motor vehicle. Following his arrest, Gibbs was interviewed by Det. Thorp and Sgt. Noles at the Cobb County Police Department, during which Gibbs made custodial statements.

Gibbs seeks to suppress those statements.  [Doc. 78].  The videotaped custodial interview was introduced into evidence as Government Exhibit 13.  [Doc. 256 at 182].

At the beginning of the interview, Det. Thorp introduced himself and told Gibbs that he wanted to talk with him about an ongoing investigation.  [Id. at 173].  He then asked Gibbs some preliminary background information, such as Gibbs's name, date of birth, education level, whether he was intoxicated, and whether he could read, write and speak English.  [Id. at 174].  Gibbs had a tenth grade education.  [Id. at 192].

Det. Thorp began reading Miranda rights to Gibbs from a printed form used by the Cobb County Police.  When Det. Thorp was about 75 percent done with the reading of the rights, Gibbs interrupted Thorp and asked whether he could still talk with the police if he spoke with a lawyer.  [Id. at 174-75].  In response, Det. Thorp told Gibbs that Det. Thorp would finish reading the rights and Gibbs's question would likely be answered.  [Id. at 175].  Det. Thorp then finished reading the rights.  [Id.].  Det. Thorp never specifically answered Gibbs's question.

When Det. Thorp completed his reading of the Miranda rights, he asked Gibbs whether he understood his rights, and Gibbs acknowledged that he understood.  [Id.].  Det. Thorp then asked Gibbs to read aloud the "waiver" portion of the Miranda form.  [Id. at 176].  Gibbs read the waiver aloud and agreed to speak with Det. Thorp.  [Id.].  However, Gibbs told Det. Thorp that he did not want to sign the form because he "didn't

19

feel comfortable" and he did not sign a written waiver of his rights. [Id. at 190]. The officers told Gibbs that there was no requirement for him to sign the form, and they proceeded to interview Gibbs. [Id.]. Neither officer made any threats or promises to Gibbs.

Approximately thirty to forty minutes into the interview, Gibbs asked Det. Thorp if he could have advice from an attorney, and the interview ended at that point. [Id. at 180, 191].

**B.   Discussion of Gibbs's Custodial Statements**

The government established that Gibbs was advised of his Miranda rights. The court must also determine whether Gibbs voluntarily, knowingly, and intelligently waived those rights. This inquiry is twofold:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986) (internal quotation marks and citations omitted).

Gibbs argues that the circumstances – in particular (1) his question during the Miranda warnings; (2) the lack of an answer to his question; and (3) his refusal to sign the Miranda waiver because he "did not feel comfortable" – should result in a finding that the government did not establish that he voluntarily, knowingly, and intelligently waived his rights.

However, Gibbs's question –  could he still talk with the police if he spoke with a lawyer – does not indicate any reluctance to talk to the police or lack of understanding that he had the right to remain silent and the right to an attorney.  If anything, Gibbs's question indicates that he did want to talk to the officers and understood that he could talk to an attorney if he wanted to do so.  In fact, Gibbs's request for advice from an attorney about thirty to forty minutes into the interview indicates that he understood that he was entitled to an attorney before he answered questions and that he could stop answering questions at any time.

Gibbs does not contend that the Miranda warnings he received were incomplete or inaccurate.  He cites no authority that the police were required to deviate from, or interrupt, the standard Miranda warnings and answer Gibbs's question before completing the warnings and obtaining his oral waiver of his rights.  At most, Gibbs's question amounted to a statement concerning the right to counsel that was ambiguous or equivocal.  The police are not required to end their interrogation in response to such

21

statements.  See Davis v. United States, 512 U.S. 452, 459-62, 114 S. Ct. 2350, 2357 (1994) (concurring that the accused's remark, "Maybe I should talk to a lawyer," was not a request for counsel, and law enforcement agents therefore were not required to stop questioning the accused).

Moreover, Gibbs's refusal to sign the written form does not mean that his oral waiver was ineffective.  United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010); United States v. Dowd, 451 F.3d 1244, 1250-51 (11th Cir. 2006); United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 2000) (refusing to sign waiver and refusal to make a written confession does not mean an oral waiver was ineffective).  The evidence is undisputed that after the officers read Gibbs his rights and Gibbs read the waiver portion aloud, Gibbs acknowledged that he understood his rights and agreed to speak with the officers without a lawyer present.

Considering the totality of circumstances, and applying the standards discussed above, I find that Gibbs knowingly and voluntarily waived his Miranda rights. I therefore **RECOMMEND** that Gibbs's Motion to Suppress  Statements [Doc. 78] be **DENIED**.

## VII.  CLARK'S MOTION TO SUPPRESS STATEMENTS

### A.      Facts Relating to Clark's Statements

On February 4, 2013, Atlanta Police detectives Zimbrick and Demester went to Clark's home to attempt to speak with him about their investigation of carjackings and homicides.  Clark was not home at the time, and the officers spoke with Clark's mother.  Det. Zimbrick gave Clark's mother his business card and told her that they did not have a warrant for Clark's arrest and that they just wanted to talk to him.  Clark's mother agreed to give the message to Clark.  [Doc. 256 at 73].

Shortly thereafter, Det. Zimbrick received a phone call from Clark.  Clark told Det. Zimbrick that he was back home and Det. Zimbrick could come over and pick him up and interview him about his investigation.  Clark said that he wanted the officers to take him away from the house in handcuffs.  Det. Zimbrick thought that Clark made this request so that it would not appear to people in the neighborhood that Clark was cooperating with the police.  [Id. at 73, 103].

The officers went back to Clark's house and had him acknowledge that the handcuffs were at his (Clark's) request.  The officers explained to Clark that they did not have a warrant for his arrest and that he was free to terminate the interview at any time.  They told Clark that no matter what happened, they were not going to arrest him

23

that day.  The officers then placed Clark in handcuffs and walked him out to their car. [Id. at 74].  Neither officer brandished a weapon.  [Id. at 105].

The officers took Clark to a park near a police precinct.  They sat in the car in the parking lot of the park and had a conversation with Clark for about fifteen minutes.  The officers did not give Clark Miranda warnings.  The handcuffs were not removed during the interview.  [Id.].  The officers did not threaten Clark or make any promises.  [Id. at 75-76].  After the interview, the officers took Clark home.  [Id. at 77].  The meeting with Clark was recorded.  [Gov't Ex. 7].

On February 6, 2013, Clark turned himself in to police headquarters in response to an arrest warrant.  Clark was taken to an interview room where he was seated in a chair and his handcuffs were removed.  [Doc. 256 at 150-51; Gov't Ex. 11].  Atlanta Police Detective Velasquez arrived in the interview room shortly after Clark was placed there.  Prior to any questioning occurring, Det. Velasquez asked Clark several background questions regarding his educational level, competence, and whether he was under the influence of any drugs or alcohol.  [Doc. 256 at 153; Gov't Ex. 11].  Clark responded to each question and informed the detective that he was not under the influence of any drugs or alcohol, but that he did have a shot of vodka two hours before he turned himself in.  [Doc. 256 at 153].

24

Det. Velasquez then read to Clark his complete <u>Miranda</u> warnings from Det. Velasquez's police-issued <u>Miranda</u> card.  [<u>Id.</u>; Gov't Ex. 9].  After each section, Det. Velasquez asked Clark if he understood, and Clark responded that he understood.  [Doc. 256 at 153].  The detective did not make any threats or promises.  Clark did not appear to be under the influence of alcohol or drugs.  [<u>Id.</u> at 154].  The interview was recorded.   [<u>Id.</u> at 156; Gov't Ex. 11].  Due to a flaw in the recording system, the first two lines of the <u>Miranda</u> warnings were not recorded.  [<u>Id.</u> at 157].  After being advised of his rights, Clark agreed to speak with Det. Velasquez without an attorney.  [<u>Id.</u> at 153].

**B.    Discussion Relating to Clark's Statements**

<u>Miranda</u> warnings are required only when the person being questioned is in custody.  <u>Illinois v. Perkins</u>, 496 U.S. 292, 296-97, 110 S. Ct. 2394, 2397 (1990).  A person is in custody if, under the totality of circumstances, a reasonable person would not feel free to end the encounter and leave.  <u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 663-65, 124 S. Ct. 2140, 2148-49 (2004).  Clark argues that he was in custody at the time of his February 4, 2013 statements and, therefore, should have been given <u>Miranda</u> warnings.  [Doc. 228 at 2].  However, the evidence is clear that Clark was not in custody on that date.  The only reason that Clark was in handcuffs was because Clark requested to be handcuffed.  The officers informed Clark that he was not under arrest.  Therefore,

a reasonable person in Clark's position would have felt free to end the encounter and leave, or request that the officers return him to his home.

Clark was in custody when he made his statements to Det. Velasquez two days later on February 6, 2013.  However, prior to any questioning (other than standard background questions), Det. Velasquez advised Clark of his <u>Miranda</u> rights, and Clark knowingly and voluntarily waived those rights.

For these reasons, I **RECOMMEND** that Clark's Motion to Suppress Statements [Doc. 228] be **DENIED**.

## VIII.  CLARK'S MOTION TO SUPPRESS IDENTIFICATION

Clark filed a Preliminary Motion to Suppress Identification [Doc. 229] in which he states that on January 31, 2013, a robbery victim allegedly identified Clark from a six-photo lineup.  The government was required to provide Clark with the photo lineup in discovery, and Clark does not indicate that he does not have it.  Clark asked for an evidentiary hearing regarding the circumstances of the identification, speculating that the procedures employed in the identification may have been suggestive.  [<u>Id.</u>].

Short of "a very substantial likelihood of irreparable misidentification," any evidence suggesting an incorrect identification is for the jury to weigh.  <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114, 116, 97 S. Ct. 2243, 2254 (1977).  Moreover, the court is not required to hold a hearing outside the presence of the jury whenever a defendant

challenges the admissibility of a witness's identification.  See Watkins v. Sowders, 449

U.S. 341, 349, 101 S. Ct. 654, 659 (1981) (holding that the due process clause of the

Fourteenth Amendment does not require a *per se* rule that a hearing outside the presence

of the jury be conducted whenever a defendant challenges the admissibility of a

witness's identification).

Clark has provided no information to the court to support a finding that any

identification procedures used to identify him were suggestive.    Therefore,

I **RECOMMEND** that his Preliminary Motion to Suppress Identification [Doc. 229] be

**DENIED**.

## IX.   RONALD WASHINGTON'S MOTIONS TO SUPPRESS

Ronald Washington has entered a plea of guilty.  [Doc. 232]  Therefore, his

motions [Docs. 197, 200, and 225] should be deemed withdrawn.

## X.   BRANDON WASHINGTON'S MOTION TO SUPPRESS STATEMENTS

Brandon Washington seeks to suppress all statements that he made to law

enforcement officers.  [Doc. 205; Supplemented, Doc. 264].

### A.   Facts Relating to Brandon Washington's Motion to Suppress Statements

On January 30, 2013, Detective Brett Zimbrick and Investigator Vincent

Velasquez of the Atlanta Police Department interviewed Brandon Washington.

[Doc. 256 at 60].  The interview was prompted because Washington's fingerprint had been identified in a vehicle that had been carjacked.  [Id.].  Det. Zimbrick and Inv. Velasquez traveled to an apartment complex that was Washington's last known address where they hoped to locate and talk with Washington.  [Id.].

When the officers spotted Washington walking through a parking lot near the apartment complex, they approached him, identified themselves, and asked if they could talk with him about an investigation that they were conducting.  [Id. at 61].  The officers told Washington that they had no warrant for his arrest, he was not under arrest, and that he was under no obligation to speak with them.  [Id. at 63].  Washington indicated that he was willing to talk to the officers.  [Id.].

The officers brought Washington back to his mother's residence and stood on the front porch.  They explained to Washington's mother and again to Washington that he was under no obligation to speak to them.  [Id.].  Washington agreed to speak to the officers.  The officers and Washington then entered the officers' car where the officers again told Washington that he was under no obligation to speak to them.  The officers also told him that the doors were unlocked and that he was free to leave at any time.  [Id. at 64].  The officers did not use physical force or make any threats.  [Id.].  The interview was recorded and introduced into evidence.  [Id. at 67; Gov't Ex. 6].  Washington was not arrested at that time.

On February 3, 2013, Det. Zimbrick and Inv. Quinn from the Atlanta Police Department conducted a second interview of Washington. [Doc. 256 at 68, 70]. Det. Zimbrick arranged the interview by calling Washington and requesting a time to talk to determine whether Washington had additional information. [Id. at 68]. Washington walked to the car driven by Det. Zimbrick and got in. [Id. at 69]. Det. Zimbrick explained to Washington that he did not have to speak with the officers, that Det. Zimbrick did not have a warrant for Washington's arrest, and that Washington was not under arrest. [Id. at 69-70]. Washington decided to speak with Det. Zimbrick and Inv. Quinn, and the interview lasted approximately 10-15 minutes. [Id. at 70]. Washington was not restrained, and the officers made no threats or promises. [Id.]. The February 3rd interview was also recorded. [Id. at 72; Gov't Ex. 6].

**B.      Discussion of Brandon Washington's Motion to Suppress Statements**

Washington argues that his statements are not admissible because he was not given Miranda warnings. [Doc. 264]. However, the government established that Washington was not in custody on both of the occasions when he was interviewed by police officers. As discussed above with respect to co-defendant Clark, Miranda warnings are required only when a person is in custody. Applying the legal standards discussed above with respect to Clark's statements, the government established that Washington was not in custody at the time the officers interviewed him and that his

statements were voluntarily made.  Therefore, Brandon Washington's Motion to Suppress Statements [Doc. 205; Supplemented, Doc. 264] should be **DENIED**.

## XI.    RAPHEAL BANKS'S MOTIONS TO SUPPRESS

Rapheal Banks moves to suppress the police chase and arrest that ultimately led to his statements to the police.  [Docs. 191, 262].  He does not move to suppress his statements made subsequent to his arrest.

### A.    Facts Related to Banks's Motions to Suppress

Banks was arrested by Brad Arrowood, a Georgia State Patrol officer, on January 18, 2013.  Officer Arrowood was operating a laser speed detection device near the Moreland Road overpass on I-20 westbound when he clocked Banks traveling 104 miles per hour in a 55 mile per hour area.  [Doc. 257 at 10, 14].  Banks exited the interstate and attempted to elude Officer Arrowood while driving at excessive speeds and driving on the sidewalk through downtown Atlanta.  [Id. at 18-24].  Banks eventually hit a planter and crashed the vehicle he was driving.  He then exited the vehicle and ran.  Officer Arrowood eventually apprehended Banks.  [Id. at 24-25].  Banks had a prison identification card in his pocket with the name Rapheal Banks.  [Id. at 27-28].  The high speed chase was recorded by a video camera in Officer's Arrowood's vehicle.  [Gov't Ex. 16].   In the video, Banks can be heard talking about the carjacking of a Cadillac Escalade.  [Gov't Ex. 16 at 15:37].

30

After Banks was arrested, he was taken to the Cobb County Police Department. [Doc. 257 at 29].  At the Cobb County Police Department, Sgt. Thorp advised Banks of his rights, obtained a waiver of rights from Banks, and interviewed Banks.  [Id. at 35-41].  Thorp correctly identified Banks in court.  [Id. at 34].  A recording of Thorp's advice of rights and interview of Banks was introduced into evidence.  [Id. at 45; Gov't Ex. 17].

### B.    Discussion of Banks's Motion to Suppress

The video of the police chase introduced into evidence clearly establishes that there was probable cause to pursue and arrest Banks, at the very least, for reckless driving and speeding.  [Gov't Ex. 16].  Therefore, there is no basis to suppress the police chase and arrest which ultimately led to Banks's statements to the police about the carjacking.

While the court recalls that Officer Arrowood misidentified Banks at the suppression hearing [Doc 257 at 27], Sgt. Thorp correctly identified Banks.  Moreover, there is ample other evidence of Banks's identity, including two recordings by the police.  [Gov't Exs. 16 and 17].

For the above reasons, I recommend that Banks's Motion to Suppress [Docs. 191, 262] be **DENIED**.

31

## XII.   BANKS'S MOTION TO SEVER

Banks is charged together with defendants Gibbs, Turner, and Stinson in one count of the second superseding indictment (Count Thirteen) with a carjacking that was committed on January 18, 2013.  [Doc. 106].  Banks is not charged in any other counts in the indictment.  He moves to sever his case from that of his co-defendants under Federal Rules of Criminal Procedure 8 and 14.  [Doc. 194].

When a case involves multiple defendants, Rule 8(b) of the Federal Rules of Criminal Procedure governs the issue of joinder.  See United States v. Lane, 474 U.S. 438, 466 n.1, 106 S. Ct. 725, 740 n.1 (1986).  Rule 8(b) provides:

> **Joinder of Defendants.**  The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).  The court must look to whether the charges are united by some "substantial identity of facts and/or participants."  United States v. Morales, 868 F.2d 1562, 1569 (11th Cir. 1989) (citations omitted).  This is done by examining the allegations contained in the indictment.  United States v. Liss, 265 F.3d 1220, 1228 (11th Cir. 2001).  The court may also consider the government's proffer.  See United States v. Dominguez, 226 F.3d 1235, 1241 (11th Cir. 2000) ("If the indictment fails to

32

show and the prosecutor fails to proffer a sufficient basis in the expected evidence to justify joinder, then a severance should be ordered.").

"In order to meet the same series of acts or transaction requirement of Rule 8(b)[,] the government must demonstrate that the acts alleged are united by substantial identity of facts and/or participants[;] ... [however, e]ach participant need not participate in all acts or even know the other participants' roles in the ventures." United States v. Holloway, 971 F.2d 675, 679 (11th Cir. 1992) (internal citations and quotation marks omitted); see also United States v. Aiken, 76 F. Supp. 2d 1346, 1351 (S.D. Fla. 1999) ("Joinder of multiple defendants is proper whenever there is a common thread between the actions charged against them.") (citation and internal quotation marks omitted).

Fed. R. Crim. P. 14 allows for severance if it appears that a defendant will be prejudiced by a joinder of offenses or defendants. "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539, 113 S. Ct. 933, 938 (1993). Generally, defendants who are jointly indicted should be tried together. See United States v. Morales, 868 F.2d 1562, 1571 (11th Cir. 1989).

33

The government has stated that because of the <u>Bruton</u> issues discussed above –
*i.e.*, statements by co-defendants that implicate Banks – the only co-defendant with
whom Banks can be jointly tried is Andre Clark. [Doc. 257 at 132-33]. Clark is charged
in Counts One, Two, Four, and Six with carjackings that took place on December 29,
2012 and January 2, 2013. [Doc. 106]. Clark made no statements that implicate Banks.
[Doc. 257 at 132-33]. The government contends generally that "the evidence will show
that the transaction in which Banks engaged jointly with Gibbs[,] Turner[,] and Stinson,
which was the basis for Counts Thirteen through Fifteen of the indictment, was part of
a series of transactions that was put in motion by Defendant Gibbs and Turner and
charged in the previous counts." [Doc. 218 at 5]. However, the government has not
made a specific proffer that shows a connected series of transactions or any connection
between Banks and Clark. <u>Cf</u>. <u>United States v. Cole</u>, No. 1:10-CR-00468-TCB-JFK,
2012 WL 3229383 (N.D. Ga. July 18, 2012) (discussing detailed proffer made by
government before deciding that defendants were properly joined even though they were
charged with separate bank robberies).

Banks and Clark are charged with separate carjackings involving different people
on different dates, and the government has not proffered that the evidence against them
would overlap. At this stage, the indictment and the government's proffer do not
provide a basis for the court to conclude that there is a sufficient identity of facts and/or

34

participants to justify a joint trial of Banks and Clark. However, in the interest of judicial economy, I will defer this motion to the district judge who may wish to give the government another opportunity to justify a joint trial of Banks and Clark closer to the time of trial. Also, because of the possibility of guilty pleas, the issue of severance may become moot once this case is scheduled for trial.

## XIII. BANKS'S *PRO SE* MOTION

The docket contains a handwritten letter from Banks which the court has deemed a motion for miscellaneous relief. [Doc. 284]. Because Mr. Banks is represented by counsel, the court will not consider his *pro se* motion.

## XIV. CONCLUSION

For the reasons discussed above, I **RECOMMEND** that Turner's Preliminary <u>Bruton</u> Motion to Suppress Statements of Non-Testifying Co-Defendants [Doc. 57] be **GRANTED IN PART** to the extent that his motion seeks a severance from co-defendants other than Defendant Clark.

I **RECOMMEND** that Ronald Washington's motions [Docs. 197, 200, and 225] be deemed **WITHDRAWN** because he has entered a guilty plea.

I **RECOMMEND** that Banks's motion to sever [Doc. 194] be **DEFERRED** to the district court.

I **RECOMMEND** that all other pending motions be **DENIED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

   **IT IS SO RECOMMENDED** this 20th day of May, 2015.


_____
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE